ENERGETICS, LTD v WHITMILL

Docket Nos. 91653, 91656. Argued October 15, 1992 (Calendar No. 10).
   Decided March 30, 1993.

Energetics, Ltd., brought an action in the Clare Circuit Court
against Elmer and Virginia Benchley, Oak R. Whitmill and
other heirs of Edwin Whitmill, and the Northern Michigan
Hospital Foundation, seeking a determination of the proper
distribution of oil and gas royalties for oil and gas interests in a
certain eighty-acre parcel of land. The Benchleys are surface
owners of the land and have a 35/80 interest in the oil and gas
rights. The Whitmill heirs and NMHF assert 40/80 and 5/80
interests respectively. The Benchleys challenge those interests,
contending that they were abandoned, being dormant for more
than twenty years. MCL 554.291 et seq.; MSA 26.1163(1) et seq.

   In 1951, leases were executed and recorded with respect to
the Whitmill and NMHF interests, and each remained in effect
until the expiration of its primary term in 1961. Similar leases
were executed and recorded in 1977 and 1978. After oil was
discovered and production began in 1985, an interpleader ac-
tion was initiated to determine the proper distribution of
royalties. The Benchleys asserted title to the interests claimed
by the Whitmills and the NMHF on the ground that no qualify-
ing document had been recorded during a twenty-year period
before the recording of the leases in 1977 and 1978. The court,
Kurt N. Hansen, J., found that each of the leases recorded in
1951 had remained in effect until the expiration of its primary
term in 1961, and that when each lease expired the interest
was transferred back to the lessor in accordance with the terms
of a recorded instrument, commencing a new twenty-year
period. The Court of Appeals, GILLIS, P.J., and MACKENZIE and
WEAVER, JJ., reversed in an opinion per curiam (Docket No.
124614). The Whitmills and the NMHF appeal.

   In an opinion by Justice GRIFFIN, joined by Chief Justice
CAVANAGH, and Justices LEVIN, BRICKLEY, BOYLE, and MALLETT,
the Supreme Court held:

   Where a severed oil and gas interest in land is leased by
recorded instrument for a primary term of less than twenty
years, a new twenty-year dormancy period commences when

the reversionary interest is transferred at the termination of the lease.

1. The purpose of the dormant minerals act is not to vest title to the severed interests in the surface owner, but rather to facilitate the development of those subsurface properties by reducing the problems presented by fragmented and unknown ownership. Ownership of a severed oil or gas interest is deemed abandoned in favor of the surface owner unless at any time during a twenty-year period the interest is sold, leased, mortgaged, or transferred by recorded instrument; the owner has recorded a claim of interest; a drilling permit has been issued; production or withdrawal of oil or gas occurs; or the interest is used in underground storage operations. A transfer of an interest in oil and gas occurs both when a lease takes effect and when the leasehold interest reverts to the interest owner upon termination of the lease. "Transfer by instrument recorded" includes the reversion that occurs at the termination of a recorded lease.

2. In these cases, because the interests at issue were transferred when the recorded leases expired in 1961, and subsequently were leased less than twenty years later, the trial court properly determined that they were not abandoned by operation of the act.

Justice RILEY concurred in the result only.

Justice LEVIN, writing separately, stated that because the lease in this case was for a term of ten years, the question whether payment of delayed rentals would commence the running of a twenty-year period under the statute with respect to a lease whose term exceeds twenty years was not presented and cannot be decided.

Reversed.

189 Mich App 247; 471 NW2d 641 (1991) reversed.

*James A. Siver* for the plaintiff.

*Honigman, Miller, Schwartz & Cohn* (by *Mark A. Stern*) for defendant-appellant Northern Michigan Hospital Foundation.

*Dreyer & Ulicki* (by *David J. Dreyer*) for defendants-appellees Benchley.

*Donald C. Coulter* for defendants-appellants Whitmill, Straus, Griffin, Austin and Beebe.

GRIFFIN, J. These consolidated appeals require us to decide whether certain severed oil and gas interests in a tract of land were properly "deemed abandoned" in favor of the surface owners by operation of the dormant minerals act.[1] Because, as we construe the act,[2] the interests in question were not abandoned, we reverse the decision of the Court of Appeals.

---

[1] MCL 554.291 *et seq.*; MSA 26.1163(1) *et seq.* Although the act applies only to severed oil and gas interests in land, the statute is commonly referred to as the "dormant minerals act." See *Mask v Shell Oil Co*, 77 Mich App 25, 27, n 1; 257 NW2d 256 (1977). A mineral interest is "severed" from the surface estate when it is "owned by a person other than the surface owner." 8 Williams & Meyers, Oil and Gas Law, p 1141.

[2] Section 1 of the dormant minerals act provides:

> Any interest in oil or gas in any land owned by any person other than the owner of the surface, which has not been sold, leased, mortgaged or transferred by instrument recorded in the register of deeds office for the county where such interest is located for a period of 20 years shall, in the absence of the issuance of a drilling permit as to such interest or the actual production or withdrawal of oil or gas from said lands, or from lands covered by a lease to which such interest is subject, or from lands pooled, unitized or included in unit operations therewith, or the use of such interest in underground gas storage operations, during such period of 20 years, be deemed abandoned, unless the owner thereof shall, within 3 years after the effective date of this act or within 20 years after the last sale, lease, mortgage or transfer of record of such interest or within 20 years after the last issuance of a drilling permit as to such interest or actual production or withdrawal of oil or gas, from said lands, or from lands covered by a lease to which such interest is subject or from lands pooled, unitized, or included in unit operations therewith, or the use of such interest in underground gas storage operations, whichever is later, record a claim of interest as hereinafter provided. Any interest in oil or gas deemed abandoned as herein provided shall vest as of the date of such abandonment in the owner or owners of the surface in keeping with the character of the surface ownership.

> The phrase "drilling permit" shall mean a permit to drill an oil or gas well issued by the conservation department or its successor. [MCL 554.291; MSA 26.1163(1).]

I

The relevant facts bearing upon the principal
issue in these appeals are not in dispute.[3] Elmer
Benchley and his wife, Virginia, own the surface
and an undisputed 35/80 interest in the oil and
gas rights in an eighty-acre parcel of land in Clare
County. The heirs of Edwin Whitmill claim a
40/80 interest in the oil and gas rights, and Northern
Michigan Hospital Foundation (NMHF) claims the
remaining 5/80 share of the oil and gas rights in
the eighty-acre tract. However, the Whitmill and
NMHF claims are challenged by the Benchleys, who
contend that those severed interests were dormant
for more than twenty years and therefore were
abandoned by operation of the act.

With respect to each of the disputed interests, a
lease was executed and recorded in 1951, giving
Sun Oil Company the right to drill for oil and gas
during a primary term of ten years. Each lease
provided for termination after the first year or any
year thereafter in which drilling or production
operations were not undertaken unless "delay
rental" payments were made by the lessee. The
trial court determined that delay rental payments
were made as required and that each lease re-
mained in effect until the expiration of its primary
term in 1961.[4]

Subsequently, in 1977 in the case of the Whit-
mill interest, and in 1978 in the case of the NMHF
interest, similar leases in favor of another develop-
ment company were executed and recorded. After

[3] Although there are two appeals before us that have been consoli-
dated, they arise out of a single case that was presented for decision
on stipulated facts in the Clare Circuit Court. For a more complete
statement of the facts, see the Court of Appeals opinion, *Energetics,
Ltd v Benchley,* 189 Mich App 247; 471 NW2d 641 (1991).

[4] This determination by the trial court was not challenged on
appeal.

oil was discovered and production from the eighty-acre parcel began in 1985, an interpleader action[5] was initiated to determine the proper distribution of royalties. As surface owners, the Benchleys asserted title to the interests claimed by the Whitmills and NMHF on the ground that no qualifying document had been recorded during a twenty-year period before the recording of the leases in 1977 and 1978.

. The trial court ruled that the statutory twenty-year dormancy period had not run, and that the disputed interests therefore were not abandoned. The circuit judge reasoned that when each of the Sun Oil leases expired in 1961, the leased interest was "transferred" back to the interest owner in accordance with the terms of a recorded instrument, and that a new twenty-year period then commenced. On appeal, the Court of Appeals disagreed, and reversed.[6] We then granted leave to appeal.[7]

## II

Enacted in 1963,[8] the dormant minerals act focuses upon a problem that frequently arises when oil and gas rights are severed from the surface estate and then remain undeveloped for long periods of time.[9] In the words of one commentator:

---

[5] See MCR 3.603.

[6] *Energetics, Ltd v Benchley,* n 3 *supra.*

[7] 439 Mich 1022 (1992).

[8] 1963 PA 42.

[9] For a discussion of problems resulting from the severance of mineral rights, see, generally, Street, *Need for legislation to eliminate dormant royalty interests,* 42 Mich St B J 49 (March, 1963). See also Smith, *Methods for facilitating the development of oil and gas lands burdened with outstanding mineral interests,* 43 Tex L R 129 (1964); Kuntz, *Old and new solutions to the problem of the outstanding undeveloped mineral interest,* 22 Oil & Gas Inst 81 (1971); Outerbridge, *Missing and unknown mineral owners,* 25 Rocky Mtn L Inst

The problem results from the fact that perpetual or very long term mineral interests may be created during a period of activity in a particular industry, and these interests do not terminate when the activity ceases. Ownership of the minerals may thus be lodged in individuals who have long disappeared from the area, leaving no trace, and making it impossible to further develop the mineral estate . . . . [Polston, *Legislation, existing and proposed, concerning marketability of mineral titles,* 7 Land & Water L R 73 (1972).]

The act addresses this problem by providing, in summary, that ownership of a severed oil or gas interest shall be "deemed abandoned" in favor of the surface owner unless at any time during a twenty-year period:

- The interest has been "sold, leased, mortgaged or transferred" by recorded instrument;

- The owner has recorded a "claim of interest";

- There has been "issuance of a drilling permit";

- There has been "production or withdrawal of oil or gas" from land in which the interest is held, or from lands "pooled, unitized or included in unit operations" with lands in which the interest is held; or

- The interest has been used "in underground storage operations."

20-1, 20-5 (1979); Hardy, *Ancient mineral claims—An obstacle to development,* 28 Oil & Gas Inst 137 (1977).

However, as this Court explained in *Van Slooten v
Larsen,* 410 Mich 21, 44; 299 NW2d 704 (1980), the
purpose of the act is "not to vest title to the
severed interests in the surface owner but rather
is to facilitate the development of those subsurface
properties by reducing the problems presented by
fragmented and unknown ownership."[10]

### III

The Benchleys maintain that the dormant min-
erals act clearly and unambiguously requires a
new recording at least once every twenty years in
order to preserve ownership of a severed oil and
gas interest. Appearing to adopt that position, the
Court of Appeals panel in this case stated:

> By requiring a periodic recording of mineral
> interests in the register of deeds office, once every
> twenty years, the Legislature provided a means of
> insuring that a person interested in purchasing or
> leasing mineral rights would have information, not
> older than twenty years, about the identity and
> whereabouts of the owners of those mineral rights.
> [189 Mich App 247, 256; 471 NW2d 641 (1991).]

We disagree with the Court of Appeals to the
extent that its opinion can be read to suggest that
the act is merely a "recording statute" which
automatically triggers forfeiture of title whenever
a twenty-year period elapses without the recording
of an instrument. As already indicated, although
the statute refers to five types of activity that toll

---

[10] The constitutionality of the act was upheld by this Court in *Van
Slooten* against claims that it impaired the obligation of contract and
violated due process and equal protection guarantees. In *Texaco, Inc v
Short,* 454 US 516; 102 S Ct 781; 70 L Ed 2d 738 (1982), the United
States Supreme Court upheld the constitutionality of an Indiana
dormant minerals act. That Court later dismissed an appeal from this
Court's decision in *Van Slooten.* 455 US 901 (1982).

the running of a dormancy period, only the first two listed above involve a recording requirement. Even though recording clearly is an important component of the act's design, the Legislature has not relied on recording as the exclusive means to further its objectives.

On the other hand, the Whitmills and NMHF advance two arguments to support their claims. First, they argue for an interpretation of the word "leased" in the act that would preclude the running of a twenty-year dormancy period while a severed interest remains subject to a recorded lease, asserting that an oil and gas interest is just as leased on the last day of a lease as it is on the first day. Some support for this approach can be found in the dictionary. When used as a verb, "lease" may mean "to grant or convey to another by lease" or "to be under lease or be subject to lease." *Webster's Third New International Dictionary, Unabridged Edition* (1966), p 1286. Thus, common usage of the word suggests that two interpretations might be applicable in this situation: one that would commence a twenty-year period upon execution and recording of a lease, and a second meaning, urged on us by the Whitmills and NMHF, that would toll the running of a dormancy period while the severed interest remains subject to a lease.

They argue that the second meaning would serve the act's ultimate goal, the development of oil and gas interests.[11] However, we must recognize that the expansive interpretation of the word

---

[11] This is also the primary purpose of an oil and gas lease. *Kinne v Swanson Consolidated Oil Co,* 293 Mich 509, 513; 292 NW 472 (1940). As one commentator has explained, the various clauses of the typical oil and gas lease are "inherently component parts of a general scheme to secure the testing, development, and operation of the demised land for oil and gas through the creation of an aggregate of legal relations designed to be fair to both parties to the contract." 2 Summers, Oil and Gas, § 331, pp 351-352.

"leased" urged by the Whitmills and NMHF could work also to undermine the purposes of the dormant minerals act. If such a construction were adopted, there would be nothing to prevent the owner of a severed interest from executing a lease with a primary term much longer than twenty years. Thus, a severed interest might be sheltered from the operation of the act for an indefinite period.[12] Obviously, if the Legislature had intended that result, it easily could have provided explicitly that the twenty-year dormancy period shall not run during a period when a severed interest is "subject to a lease."[13] It did not do so, and we are convinced that such a broad interpretation of the word "leased" was not intended.

As their second argument, the Whitmills and NMHF maintain that a "transfer" by recorded instrument, within the meaning of the act, occurred in 1961 at the termination of the leases to Sun Oil. The trial court adopted this approach and determined that two transfers occur when an interest in oil and gas is leased: one at the execution of the lease, and a second when the lease is terminated. Applying this reasoning, the court explained:

> The recorded lease clearly indicated that Sun Oil acquired certain rights in the oil and gas rights in 1951. The recorded lease further indicated that these rights were transferred back to the Whitmills in 1961, when the lease terminated by its own terms. Both of these transfers of inter-

[12] The Benchleys argue that under this interpretation, the permissible duration of an oil and gas lease would be limited only by the Uniform Statutory Rule Against Perpetuities, MCL 554.71; MSA 26.48. It has been suggested that the duration of such a lease would be limited by the marketable record title act, MCL 565.101 et seq.; MSA 26.1271 et seq.; however, that suggestion has been questioned. See Street, n 9 supra at 52; Outerbridge, n 9 supra at 20-21; Smith, n 9 supra at 153; Hardy, n 9 supra at 153.

[13] See, e.g., ND Cent Code 38-18.1-03(4).

est were evidenced in the recorded lease. A separate act of recording would not have been necessary to put the world on notice of this event. Anyone checking the status of the title of the subject matter property would have to be on notice of the recorded lease and its expiration date, that being the expiring of the lease at the end of its term. This expiring of the lease is itself a transfer of the interest.

We agree with this analysis. Clearly, an oil and gas lease is a transfer of an interest in oil and gas. See *Jaenicke v Davidson*, 290 Mich 298, 303; 287 NW 472 (1939); *Mar Win Development Co v Wilson*, 104 NW2d 369 (ND, 1960).[14] The typical lease grants the lessee the exclusive right to enter the land to explore, drill, and produce oil and gas. 1 Williams & Meyers, Oil and Gas, § 202.1, p 21.[15] The lessor retains a reversionary interest in the mineral estate. See 3A Summers, Oil and Gas, § 601, p 310; Lampman, *Oil and gas royalty*, 42 Mich St B J 27 (March, 1963). At termination of such a lease, the oil and gas rights revert to "the grantors of the lease, their heirs or assigns." *Jupiter Oil Co v Snow*, 819 SW2d 466, 468 (Tex, 1991); *Kaiser v Love*, 163 Tex 558, 560; 358 SW2d 586 (1962).[16]

---

[14] See also 58 CJS, Mines and Minerals, § 164, p 354.

[15] Like the leases at issue in these appeals, the typical oil and gas lease provides a primary term, often five or ten years, for the duration of the lease, but requires the commencement of drilling within a shorter time, often one year. In lieu of drilling, the lessee may pay a delay rental to maintain the lease. Leases of this type are known as "unless" leases. Elkus, *Anatomy of an oil and gas lease*, 10 Mich Real Prop R 100, 105 (1983).

[16] In the absence of production of oil or gas, the termination of such a lease occurs automatically upon the expiration of the primary term, without the necessity of any action by either party to the lease. *J J Fagan & Co v Burns*, 247 Mich 674, 680; 226 NW 653 (1929); *McCullough Oil, Inc v Rezek*, 176 W Va 638, 644; 346 SE2d 788 (1986). The failure to timely pay delay rentals, where necessary, also "results in automatic termination of the lessee's interest." *Steffes v Allen*, 295

It is evident that the transfer of an interest in oil and gas occurs both when a lease takes effect and when the leasehold interest reverts to the interest owner upon termination of the lease.

IV

As employed by the Legislature in the dormant minerals act, the words "sold," "leased," and "mortgaged" refer to specific types of transactions. However, we find it significant that the Legislature, without providing further guidance, added the broader, more inclusive term "transferred" to its list of preserving events. Where the wording of a statute is ambiguous, we seek to discern the intent of the Legislature in light of the purpose sought to be accomplished. *Auto Club Ins Ass'n v Hill,* 431 Mich 449, 455; 430 NW2d 636 (1988). Mindful of this principle of statutory construction, we believe the purpose of the act will best be served by construing the statutory language "transferred by instrument recorded" to include the reversion that occurs at the termination of a recorded lease.

This construction will not allow the owner of a severed oil and gas interest to "shelter" that interest from the dormant minerals act by leasing it for a term in excess of twenty years. Moreover, we believe this construction serves the purposes of the act by avoiding abandonment of a severed interest under circumstances where it is being actively maintained.

We find it difficult to believe that the Legislature intended to impose the penalty of title forfei-

Mich 510, 513-514; 295 NW 245 (1940); *Guerra v Chancellor,* 103 SW2d 775, 778 (Tex Civ App, 1937).

ture in the circumstances presented here.[17] If the mission of the Legislature was to make it possible for a developer to locate the owners of severed oil and gas rights and obtain leases of those interests to facilitate drilling and production of oil and gas, that mission was accomplished in this case.

Our construction of the act is consistent with the result reached by the Court of Appeals panel in *Mask v Shell Oil Co,* 77 Mich App 25; 257 NW2d 256 (1977), where the Court faced somewhat similar facts.[18] In that case, the ten-year primary term of an oil and gas lease expired in 1954. Thereafter, no preserving event occurred until 1971, when another lease of the interest was executed and recorded. Concluding that the severed interest had not been abandoned by operation of the act, the *Mask* panel stated:

> Were this not so and defendants' contention

[17] Other states with statutes providing for the termination of severed mineral interests afford more protection to the interest owner than is available under our statute. For example, some states require a court action before a severed interest may be deemed abandoned. See, e.g., Conn Gen Stat Ann 47-33q(a); Cal Civ Code Ann 883.210, 883.240; Neb Rev Stat 57-228; see also Uniform Dormant Mineral Interests Act, 7A ULA, § 4(a), 1992 Supp 56. Other states provide that notice to the owner be served personally or by publication after the dormancy period expires, see, e.g., ND Cent Code 38-18.1-06; Or Rev Stat 517.180(1), and that abandonment cannot be effective unless the owner fails within a short time thereafter to claim the interest. See, e.g., Cal Civ Code Ann 883.230(c)(2); Kan Stat Ann 55-1604(b); ND Cent Code 38-18.1-05; Or Rev Stat 517.180(8); SD Cod Laws 43-30A-5; Wash Rev Code Ann 78.22.050(2)(f); Wis Stat Ann 706.057(5). As this background suggests, the statutes of sister jurisdictions reflect a deep-rooted concern about the process by which the state takes such a property interest from one person and gives it to another.

[18] When the *Mask* lease expired in 1954, a release and surrender of the lease was recorded. However, the rationale of the panel did not rest solely on the fact of recording.

The *Mask* panel pointed also to a drilling permit that had been issued in 1953 for "a portion of the land subject to the 1944 lease, although not on the exact description involved in this appeal." 77 Mich App 29. It has been suggested that this permit was not sufficient to interrupt the dormancy period, because it did not cover the exact interest subject to the lease. See Brown, *The Michigan dormant minerals act,* 10 Mich Real Prop R 116, 121 (1983).

accepted, termination of plaintiffs' interests by running of the 20-year period would have the effect of treating as abandoned those interests which were being actively maintained for nearly a 10-year period of time from 1944 to 1954. This cannot be so. *Herein, the property interests could not commence to become dormant after the original lease to Sun Oil Company dated May 31, 1944, until relinquishment and transfer back to the lessors of said lease rights in 1954.* [*Id.* at 31-32. Emphasis added.]

Following the *Mask* decision, one commentator suggested that the proper interpretation of the act is that "a recorded oil and gas lease should have the effect of postponing the commencement of a new 20-year period only until such time as the lease is no longer in effect, whether by failure of payment of delay rental, the recording of a discharge or otherwise." Brown, *The Michigan dormant minerals act,* 10 Mich Real Prop R 116, 126 (1983).

We are conscious of the fact that the stricter interpretation offered by the Court of Appeals, which we reject, might have simplified the work of those seeking to determine ownership of severed interests by searching the records. However, as this Court recognized in *Van Slooten,* the dormant minerals act "was not designed to remove *all possible* impediments to development. Its purpose is to *limit* the difficulties presented by unknown or unlocatable owners." *Id.* at 49 (emphasis added).

Moreover, we reject the contention that our construction of the act will significantly increase the burden of those seeking to determine ownership of severed interests. When a lease is recorded, the provisions of the lease are available to anyone who conducts a title search. The terms of the lease indicate whether further inquiry may be required

to determine if the lease continues in force. We are not prepared to say that such an inquiry is significantly more burdensome than determining whether, within a preceding twenty-year period, the land to which the severed interest is tied has actually produced oil or gas, was used for underground storage, or was covered by a drilling permit.

Finally, in reaching our decision, we have not overlooked the fact that the dormant minerals act stands in contravention of the common law. That was acknowledged by this Court in *Van Slooten* when we said that "the act does convert a corporeal hereditament which at common law could not be abandoned into an interest which is subject to abandonment."[19] 410 Mich 42. Where there is doubt regarding the meaning of such a statute, it is to be "given the effect which makes the least rather than the most change in the common law." 3 Singer, Sutherland Statutory Construction (5th ed), § 61.01, p 171.[20]

In light of the considerations discussed above, we hold that where a severed oil and gas interest in land is leased by recorded instrument for a primary term of less than twenty years, a new twenty-year dormancy period commences when the reversionary interest is transferred at the termination of the lease. Because the interests at issue in these appeals were transferred when the recorded leases expired in 1961, and were subsequently leased less than twenty years later, the

---

[19] In his dissent, Justice LEVIN was more succinct: "The act does not merely modify the owner's interest, it adds a term providing for its extinguishment." *Van Slooten* at 60-61.

[20] See also *Rusinek v Schultz Snyder & Steele Lumber Co*, 411 Mich 502, 508; 309 NW2d 163 (1981): "[S]tatutes in derogation of the common law must be strictly construed, and will not be extended by implication to abrogate established rules of common law. The statute, however, must be construed sensibly and in harmony with the legislative purpose." (Citations omitted.)

trial court properly determined that they were not abandoned.

## V

While their principal argument is based upon the absence of a recording during a twenty-year period, the Benchleys also challenge the Whitmill and NMHF claims on other grounds.[21] An understanding of these issues, one in each appeal, requires the recitation of additional facts.

### A

The 40/80 interest now claimed by the Whitmill heirs was leased in 1951 to Sun Oil. At that time, it was owned by Edwin Whitmill and his wife, Lola. Following the death of his wife in 1952, Edwin executed four deeds purporting to convey this interest to his children in equal shares. However, the trial court determined that, except for Edwin, who died in 1974, "[n]o one became aware of these deeds until they were discovered after his death." The deeds were placed on record in 1977 and 1978.

The Benchleys argue that recording the deeds gave rise to a presumption of delivery, and that the children of Edwin Whitmill became owners of the interest in 1952. Citing *Southwestern Oil Co v Wolverine Gas & Oil Co,* 181 Mich App 589; 450 NW2d 1 (1989), and *Wagner v Dooley,* 90 Mich App 759; 282 NW2d 469 (1979),[22] for the proposi-

[21] Because the Court of Appeals came to a different conclusion with respect to the principal issue, the panel did not reach these issues. However, the issues were briefed and argued in this Court, and we elect to address them.

[22] We find these cases inapposite. In *Southwestern,* the plaintiffs argued that their interest was preserved by natural gas storage operations conducted by a different owner with respect to a separate

tion that a preserving action must be taken by the actual owner of the interest, they maintain that because the Whitmill heirs took no such action for more than twenty-five years, the interest was abandoned.

Since we agree with the trial court that title to the severed interest did not pass to his children until Edwin Whitmill died intestate in 1974, we need not consider here what the effect might have been if they had acquired title in 1952. Although the Benchleys correctly argue that recording a deed gives rise to a presumption of delivery, this presumption merely shifts the burden of proof onto the party questioning the delivery. *Hooker v Tucker,* 335 Mich 429, 434; 56 NW2d 246 (1953); *Havens v Schoen,* 108 Mich App 758, 761; 310 NW2d 870 (1981). The purpose of the delivery requirement is to show the grantor's intent to convey the property described in the deed. *Schmidt v Jennings,* 359 Mich 376, 383; 102 NW2d 589 (1960); *Weber v Fitzpatrick,* 345 Mich 313, 317; 76 NW2d 68 (1956).

In this case, the circuit judge specifically found that the deeds in question were never delivered by Edwin Whitmill, that he had no intent to deliver them, and that title did not pass to his heirs until he died in 1974. Since we are not persuaded that these findings should be disturbed, it is unnecessary to give further consideration to this argument.

B

When the 5/80 interest now claimed by NMHF was leased in 1951 to Sun Oil, it was part of a

---

severed interest. 181 Mich App 591. In *Wagner,* the plaintiff relied on the defendant's rerecordation in 1970 of a 1941 deed; however, none of the preserving actions specified by the dormant minerals act were performed during that twenty-nine-year period. 90 Mich App 766.

40/80 share owned by Archie Cudney and his wife,
Evelyn. In 1952, the Cudneys, by recorded deed,
conveyed this 5/80 share to T. Chalmers Curtis
and his wife, Louise, predecessors of NMHF in its
chain of title. The instrument recited that the
conveyance was made subject to the 1951 Sun Oil
lease and expressly provided that delay rental
payments were to be made to the Cudneys. As
already indicated, delay rental payments were
made as required and the lease continued in effect
until its expiration in 1961.

Again, relying on *Southwestern Oil* and *Wagner,
supra,* the Benchleys contend that because the
Curtises failed to take any action on their own
behalf during the period between 1952 and 1978
when this interest was again leased, their interest
was abandoned. We disagree.

It is true, as the Benchleys argue, that a twenty-
year dormancy period commenced in 1952 when
the 5/80 interest was conveyed to the Curtises.
However, in accordance with our holding today,
another transfer occurred in 1961 when the Sun
Oil lease terminated and the leasehold interest
reverted to the Curtises.

Although the severed interest conveyed in 1952
to the Curtises did not include the right to receive
delay rental payments, we do not regard that as a
basis for defeat of their claim. The purposes of the
dormant minerals act are not frustrated by an
assignment or reservation of the right to receive
delay rental payments as long as the terms of such
a provision, as in this case, are a matter of record.
We find the Benchley argument to be without
merit.

VI

Summarizing the effect of our principal holding,

we find that the reversion that occurs at the termination of a recorded lease constitutes a "transfer" by recorded instrument within the meaning of the dormant minerals act. In each of these appeals, such a transfer occurred in 1961, when the leases to Sun Oil expired by their own terms. Because the span between 1961 and 1977 in one appeal, and between 1961 and 1978 in the other, was less than twenty years, we conclude that the Whitmill and NMHF interests were not abandoned by operation of the act.

For the reasons set forth, we reverse the decision of the Court of Appeals and reinstate the judgment of the circuit court.

CAVANAGH, C.J., and LEVIN, BRICKLEY, BOYLE, and MALLETT, JJ., concurred with GRIFFIN, J.

RILEY, J., concurred in the result only.

LEVIN, J. (*separate opinion*). I have signed the opinion of the Court. I write separately to observe that, in the instant case, the lease was for a term of ten years. Accordingly, the question whether, where the term of the lease exceeds twenty years, payment of delayed rentals is an event that commences the running of a twenty-year period under the statute, is not presented and therefore cannot be decided.